Reading Hospital v. Capital Blue Cross,
Appellant.

92

Argued June 11, 1969. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Rod J. Pera,* with him *Samuel A. Schreckengaust, Jr.,* and *McNees, Wallace and Nurick,* for appellant.

*David H. Roland,* with him *Walter M. Diener, Jr., George B. Balmer,* and *Balmer, Kershner, Mogel & Speidel,* for appellee.

94

OPINION BY MONTGOMERY, J., September 11, 1969:

In this action of assumpsit, tried before Hon. JAMES W. BERTOLET, Judge, sitting without a jury, the plaintiff, The Reading Hospital (Reading), received a decision against the defendant, Capital Blue Cross (Capital), in the amount of $1,984.65 for services rendered from May 31, 1965, to August 23, 1965, to Alfred Halsey, a subscriber to Capital's plan of hospitalization. Exceptions to the decision were dismissed and judgment was entered on the decision. This appeal followed.

For the purpose of this appeal the following may be considered as the established facts.

Two Member Hospital Agreements existed between Reading and Capital during the period of the hospitalization of Alfred Halsey at Reading. In the Member Hospital Agreement from July 1, 1962, through June 30, 1965, Reading contracted to provide Capital's subscribers ". . . hospitalization services of the type set forth in subscriber contracts currently being issued by the Plan . . ." and in the Member Hospital Agreement effective July 1, 1965, through June 30, 1966, Reading contracted to provide the subscribers ". . . all hospitalization services customarily rendered to patients by the Member Hospital and not specifically excluded by the subscriber's contract." Under both agreements, Capital agreed to pay Reading for such services, and Reading agreed not to seek payment for them from the subscriber.

The contract between Capital and Halsey is set forth in the Hospital Service Certificate Series J, which provides, inter alia, as follows:

"Article I. Definition of Terms

"1. 'Subscriber' shall mean the person who signed the application card and with whom Capital Blue Cross, hereinafter referred to as 'Blue Cross', enters into a contract, as well as each dependent, if any, listed on the application."

"3. 'Contract' shall mean the contract entered into between Blue Cross and the individual subscriber, and the amendments and riders thereto, under and by virtue of which said subscriber becomes entitled to the benefits of this service. It shall consist of the application of the subscriber, the Hospital Service Certificate, and the membership card issued by Blue Cross evidencing the acceptance of the application."

"Article V. Conditions under which Hospital Service will be rendered.

"1. Hospitalization, always subject to the limitations of the hospital selected by the subscriber, will be rendered to the subscriber on presentation of a membership card if admitted as an inpatient to a member hospital for bed care . . ."

"4. In the event of any payments under the terms of this contract, Blue Cross shall be subrogated to all the subscriber's rights of recovery against any party except such recovery as may be made by the subscriber from an insurer of the subscriber.

"5. Whenever it shall appear to Blue Cross that any third party is or may be liable for the condition of illness or injury for which the subscriber is hospitalized, the subscriber shall not be entitled to any benefits under this agreement until the subscriber shall have completely answered all questions submitted to him by Blue Cross concerning the accident or cause of such condition of illness or injury and shall have executed an assignment of all right of recovery against any third party who is or may be liable evidencing the subrogation rights of Blue Cross to the extent of benefits furnished by Blue Cross."

Halsey, as a subscriber to Capital's plan, Series J, was in possession of a card evidencing his membership, which was presented to Reading on his admission on May 31, 1965. On June 2, 1965, a notice of Halsey's admission was sent by Reading to Capital,

showing the diagnosis of his injuries on admission as "Accident, Fractured skull". In a letter dated July 16, 1965 to Reading, Capital stated, "From our investigation we feel this [Alfred Halsey] could be a subrogation case. Today, we sent Assignment Forms to our subscriber for execution. When they have been returned to us we will send the approval to the Hospital." On the same day such request for an assignment was sent by Capital directly to Halsey. Also, on the same day Capital wrote a letter to Mr. Hugh Lafferty, the alleged tortfeasor, in which it stated, "Our subscriber has notified us of the accident in which you were involved. So that we may notify your insurance company of our subrogation interest, we ask you to complete the following information and return this letter." An identical letter was sent to Mr. Lafferty on August 10, 1965. Capital sent a second request for the execution of an assignment to Halsey on August 10, 1965. Subsequently it corresponded with Halsey's attorney about the matter, including a request to represent Capital, which Halsey's attorney declined. Halsey never returned an executed assignment to Capital, with the result that on September 9, 1965, Capital notified him that because he had not given the information needed to process his claim, it was notifying the hospital that benefits were not available and the case was closed. However, on October 28, 1965, by letter, Capital again demanded the assignment from Halsey. On November 16, 1965, it advised him that it was denying him benefits; and on the same day it notified Reading that it was refusing to pay for the services rendered to Halsey because he had breached his contract with it. By stipulation between the parties in this case, it was conceded that Capital had paid Reading and many other hospitals for services rendered to its subscribers injured by third parties without asking for an assignment of the subscribers'

claims against said third parties. In December, 1965, Halsey made a claim against Hugh Lafferty, which was subsequently settled. A general release executed by Halsey was given to Lafferty.

On this appeal Capital contends that it is not obligated to Halsey for the reason that Halsey refused to execute the assignment of his cause of action against the tortfeasor, Lafferty, who allegedly caused his personal injuries, as provided by Article V. 5. in the Hospital Service Certificate. Capital further maintains that Article V. 5. is a part of the Hospital Member Agreement and thus it may assert this defense against Reading, and it is not estopped therefrom by its delay in notifying either Halsey or Reading until after Reading rendered the services to Halsey.

Capital admits on this appeal that this case involves primarily a matter of contract interpretation. The facts are not in dispute. Capital has argued that the subscriber contracts literally are to be considered as part of the Member Hospital agreements. It objects, in its brief, that the lower court has transformed ". . . this tripartite arrangement into a bilateral agreement between Blue Cross and the Hospital, whereby Blue Cross is obligated to pay the Hospital for services rendered a Blue Cross subscriber, even though that subscriber has breached his subscription contract." We do not deem it necessary to rule directly on this question raised by Capital for we believe that the controlling issue on this appeal involves interpretation of the Hospital Service Certificate.

Article V. 5. of the Hospital Service Certificate provides that the subscriber will not be entitled to "benefits" if he does not sign the assignment. The meaning of "benefits" is not clear. Therefore, the intention of the parties thereto is to be ascertained from the entire instrument. *Minnotte Appeal,* 411 Pa. 492, 192 A. 2d 394 (1963). Our examination of the cer-

tificate discloses an ambivalence in its purpose. It is not generally an insurance or indemnity contract but is mainly a contract to provide certain hospital services in member hospitals. There is no promise to pay for the services provided in member hospitals. Language appearing to be a promise to pay is used in connection with nonmember hospitals and is phrased, ". . . he will be entitled to an allowance." Article V. 1. reads, "Hospitalization . . . will be rendered to the subscriber on presentation of a membership card if admitted as an inpatient to a member hospital. . . ." Consequently, the reasonable interpretation of this contract is that it is an insurance or indemnity contract to pay for services received by the subscriber only in nonmember hospitals and it is a contract to provide hospital services in a member hospital.

Finding that the "benefits" referred to in Article V. 5. of the certificate means hospital services and not payment for hospital services in member hospitals, we cannot believe that the parties intended that benefits already provided to a subscriber would be denied or refused if the conditions of clause "5" were not met. We have said in *Galvin v. Occidental Life Insurance Company of California*, 206 Pa. Superior Ct. 61, 65, 211 A. 2d 120, 122-123 (1965) : "The intention of the parties is paramount and in construing such a contract the Court will adopt the interpretation which, under all of the circumstances of the case, ascribes the most reasonable, probable, and natural intention of the parties, bearing in mind the objects manifestly to be accomplished. . . . However, if the meaning of a written document is ambiguous or its meaning doubtful in determining the intention of the parties, the writing must be construed most strongly against the party drafting it and the interpretation which makes a rational and probable agreement must be preferred."

There are other provisions in the certificate which support the interpretation that "benefits" refers to hospital services which, having been performed, obligate Capital to make payment. By Article X, Automatic Termination, should the subscriber fail to keep up his payments and hospitalization is paid by Capital while he is not covered, "Blue Cross shall be entitled to indemnification by the subscriber for any hospital expense paid by Blue Cross under such circumstances." Article VII does not provide relief from indemnification for Capital but relieves it from providing hospital care and the return of subscription charges to the subscriber when hospitalization facilities are not available.

The efforts exerted by Capital to have the assignment executed by Halsey, to have Halsey's attorney protect its subrogation rights, and to give notice of its right of subrogation to Lafferty's insurance company are consistent with an intention on Capital's part either to consider itself obligated to provide Halsey the services contracted for under the certificate or to consider that it already had provided them. Had this not been the case and had Capital been firm in its conviction that it was not obligated to Halsey, or to the hospital, it is unlikely that it would have expended those efforts to be reimbursed for an obligation that it did not and need not incur. The actions of the parties pursuant to the contract are significant and substantial evidence of their intention. *Fenestra, Incorporated v. John McShain, Inc.*, 433 Pa. 137, 248 A. 2d 835 (1969).

The evidence shows that Halsey entered Reading Hospital, a member hospital, on May 31, 1965, and presented his Blue Cross membership card to Reading in good faith. Since it is admitted that at that time Halsey was a subscriber in good standing, Capital was contractually obligated under the subscriber contract

to provide hospital services to Halsey. It immediately began to do so, for Reading was contractually obligated under its Member Hospital Agreement with Capital to begin providing services to Halsey. Presentation of his card by Halsey to Reading simultaneously extinguished his obligation to pay Reading. The Member Hospital Agreement contains a promise by Reading not to seek payment from the subscriber but to seek it from Capital. Thus, on May 31, 1965, the rights of the parties were fixed until some change occurred as provided by the contracts. There is a presumption that a status or relationship, once shown to exist, continues in the absence of evidence to the contrary. *Donsavage Estate*, 420 Pa. 587, 218 A. 2d 112 (1966). There was no change of status of these parties until after Halsey's discharge from the hospital, when Capital notified Halsey on September 9, 1965, that it was invoking clause "5" in Article V. The question of what effect such notice by Capital to Halsey subsequently may have had on their contractual relationship is not before us on this appeal. Thus, the case of *Demmery v. National Union Fire Insurance Company*, 210 Pa. Superior Ct. 193, 232 A. 2d 21 (1967), cited by Capital, is distinguishable. That case involved an action brought by the insured parties to recover payments under the medical payment coverage of an insurance policy from the insurance company, which refused to pay because the insured parties failed to execute a subrogation agreement. In the present case, the subscriber, Halsey, is not a party to this action. That decision, therefore, will not alter our holding that the notice to Halsey on September 9, 1965, had no legal effect on the status of these parties now before us. Having already provided the benefits to Halsey that it had contracted to provide him, Capital is obligated, under its agreement with Reading, to pay Reading for those services.

In view of the above construction of the Hospital Service Certificate and its effect under the facts of this case, we find it unnecessary to pass upon the remaining contentions of the appellant.

Judgment affirmed.

HOFFMAN, J., concurs in the result.

SPAULDING, J., took no part in the consideration or decision of this case.